## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

SEAN MOHAMMED,

     Plaintiff,

     v.                      **CIVIL ACTION NO. 2:13cv469**

CENTRAL DRIVING MINI STORAGE,
INC., d/b/a MINI PRICE STORAGE,

     Defendant.

### *MEMORANDUM OPINION AND ORDER*

This Memorandum Opinion and Order is issued after a bench trial in the above-styled matter to resolve retaliation claims on the basis of religious discrimination brought under Title VII.

The Court held a two-day bench trial on January 27-28, 2015. The parties have filed post-trial briefs and this matter is now ripe for judicial determination. The Court issues the following Findings of Fact and Conclusions of Law, as required by Rule 52(a) of the Federal Rules of Civil Procedure. For the reasons set forth herein, the Court **FINDS** Defendant not liable on Plaintiff's retaliation claim based on reclassification to a floater position. The Court **FINDS** Defendant liable on Plaintiff's retaliation claim based on his termination and enters judgment for the Plaintiff.

## I. FACTUAL FINDINGS

### A.    Factual and Procedural History

Plaintiff is a Seventh Day Adventist who alleges that his former employer, Mini Price Storage, retaliated against him because he refused to work on Saturday, the religious day of observance for adherents of his faith. Plaintiff, who was at all times employed as an Assistant

1

Manager, alleges that he expressed his concerns to Tashondi Goodman ("Goodman"), the area manager who had the final word regarding his scheduling needs. When he refused to compromise on his need for a religious accommodation, i.e., to have Saturdays off, Plaintiff alleges he was reclassified as a floater and eventually terminated. Defendant argues Plaintiff was made a floater because of a business-wide decision to reduce staff hours and was terminated because of performance issues.

Plaintiff filed a two-count Complaint against Mini Price on August 21, 2013, alleging unlawful religious discrimination, with claims for hostile environment, failure to accommodate and failure to promote, and unlawful retaliation. On March 5, 2014, Defendant filed a Motion to Dismiss Plaintiff's Complaint for lack of subject matter jurisdiction and failure to state a claim. On March 19, 2014, Plaintiff filed a Motion to Amend Complaint along with his opposition to the Motion to Dismiss. On May 28, 2014, the Court granted Plaintiff's Motion to Amend as to his religious accommodation and retaliation claims. The Court denied Plaintiff's Motion to Amend his hostile work environment and failure to promote claims and dismissed them with prejudice. Defendant's Motion to Dismiss was dismissed as moot.

On November 14, 2014, Defendant filed its Motion to Dismiss for Lack of Subject Matter Jurisdiction as to Plaintiff's retaliation claim, arguing that Plaintiff failed to exhaust administrative remedies regarding Defendant's alleged interference with his award of Virginia Employment Commission ("VEC") benefits. On November 25, 2014, Plaintiff filed his Memorandum in Opposition and conceded that he did not exhaust the portion of his retaliation claim related to the VEC benefit award. Plaintiff stipulated that "he has no claim for liability and no entitlement to damages arising from any and all actions taken by Defendant with respect to his VEC unemployment claim" and submitted a proposed order to that effect. On December 23,

2

2014, upon consideration of Plaintiff's response, the Court granted Defendant's motion to dismiss the VEC unemployment claim.

On November 26, 2014, Defendant filed a Motion for Summary Judgment. On January 22, 2015, after full briefing by the parties, the Court granted in part and denied in part Defendant's Motion for Summary Judgment. The Court dismissed Plaintiff's failure to accommodate claim and Plaintiff's retaliation claim based on a reduction of hours. Plaintiff's retaliation claims based on his reclassification to a floating position and his termination remained.

**B.     Stipulated Facts**

The parties have stipulated to the following facts, which the Court accepts and finds:

1.     The Plaintiff is a citizen of Virginia and a resident of Newport News, Virginia.

2.     The Plaintiff is a Seventh Day Adventist; his religious beliefs include observation of the Saturday Sabbath.

3.     The Defendant, Central Drive Mini Storage, Inc., is a Virginia Corporation doing business as Mini Price Storage in Hampton Roads and Richmond, Virginia. Defendant is and at all relevant times was an employer within the meaning of and subject to Title VII of the Civil Rights Act of 1964, as amended.

4.     Defendant employed less than one hundred (100) employees in each of twenty (20) or more calendar weeks in Calendar Year 2010.

5.     During the interview process, the Plaintiff informed the Defendant that he was able to work every day of the week with the exception of his Sabbath, Saturday.

6.     The Plaintiff was hired on or about February 12, 2007 and was terminated on January 31, 2011.

7.     During his employment with the Defendant, the Plaintiff never worked on a Saturday.

8.     Tashondi Goodman became his Area Manager in March of 2010.

9.     On January 31, 2011, Tashondi Goodman told the Plaintiff he was terminated due to production issues.

3

10. The Plaintiff filed a claim with the Virginia Employment Commission ("VEC") on February 2, 2011.

11. On September 25, 2012, the Plaintiff and Defendant were sent *Determination and Conciliation* documents by the E.E.O.C.

12. On November 21, 2012, the E.E.O.C. notified the Defendant's counsel that no further efforts to conciliate the case would be made by the E.E.O.C.

13. On May 23, 2013, the Plaintiff was mailed a Notice of Right to Sue by the E.E.O.C.

### C. Additional Factual Findings

The Court has made the following additional factual findings:

14. Plaintiff was hired as an Assistant Manager and retained that title throughout his employment. Mohammed Dep. 11:7-8; 19:8-11.

15. His responsibilities as an Assistant Manager were to assist customers, sell storage units, sell supplies, make collection calls, and conduct marketing activities such as passing out flyers. Mohammed Dep. 19:12-20:1. These were the same responsibilities for Sales Associates.

16. Prior to becoming a full-time floating Assistant Manager, Plaintiff worked at the four (4) Mini Price locations within the Peninsula area: J. Clyde, Tyler Avenue, Pembroke, and Denbigh. Tr. 18:2-14; Mohammed Dep. 20:10-21; 44:9-13. At the beginning of his career, Plaintiff worked at a store for a period of time that ranged anywhere from one month, six months, nine months to a year, to over one year. Tr. 18:1-19:2.

17. When stationed at a particular store, that store served as Plaintiff's home base. He was considered an employee of that store and only worked occasionally at another store in the Peninsula if he was needed to fill in for someone who had taken leave. Tr. 19:24-25; 20:6-8.

18. Tashondi Goodman has been an Mini Price employee for 11 years. Tr. 153:20-23. During her tenure was a store manager from 2005 to 2006. Goodman Dep. 6:13-25. She was then promoted to area manager and in that role has overseen 15 stores in total.

19. She was the area manager for Mini Price's nine (9) Southside stores from 2006 to 2009. Goodman Dep. 12:15-20.

20. From February 2009 to June 2014, Goodman worked as an area manager for the four (4) Peninsula stores. Goodman Dep. 5:24-6:2, 11:19-22.

21.   From June 2014 to at least November 2014, Goodman served as the area manager for two (2) store locations, Valley and Indian River. Goodman Dep. 4:17 – 5:21.

22.   Goodman routinely visited her stores two or three times a week. During these visits Goodman conducted file audits and, when needed, coached any employee regarding paperwork or procedures that were done incorrectly. Goodman Dep. 40:7-15.

23.   With Goodman, coaching is not the same as counseling. Coaching addresses issues on-the-spot and is undocumented. Goodman conducted "ongoing coaching" for all of her employees. Goodman Dep. 45:5-7. In contrast, counseling is synonymous with discipline. Goodman Dep. 25:9-20.

24.   Since 2006, Goodman implemented her own policy of progressive discipline for the employees working in her stores. Counseling is part of that policy and is documented. That policy consisted of "two write-ups" before termination. The first step was to give a verbal warning which was documented on the form entitled "Verbal Counseling." This was the first write-up. If the offending behavior continued, Goodman followed up with a second document entitled "Written Warning." The third incident would result in termination. Goodman Dep. 19:6-17.

25.   The "Verbal Counseling" and "Written Warning" documents each included a section at the bottom labeled "Human Resource Use Only." Def.'s Ex. 1 & 2.

26.   Sometime in August 2010, but prior to August 30, Plaintiff engaged in his first protected activity when he had a meeting with Goodman during which time she first expressed her displeasure about the fact that Plaintiff did not work on Saturdays. Tr. 25:16-22; Mohammed Dep. 38:21-23. Goodman had asked why he wouldn't work on Saturdays and he "explained to her again [that he] was Seventh-[D]ay Adventist. This was [his] day of worship. [H]is relationship with Christ was important to [him]." Mohammed Dep. 39:3-6. *See also* Tr. 25:24 – 26:5. To which Goodman replied, "Well, since you don't work on Saturdays, that will probably qualify you to be a floater." Mohammed Dep. 39:6-8, 43:1-2; Tr. 26:6-7. Goodman also stated that his skill set and strengths made him a good choice to support the other stores. Tr. 21:16-19.

27.   On August 26, 2010, following his first protected activity, Goodman notified Mini Price management via email that as of September 1, 2010, Plaintiff would be a "full time floater for team." Joint Ex. 12.

28.   On August 30, 2010, Plaintiff engaged in his second protected activity when he had a meeting with Goodman and Joey Cole ("Cole"), the store manager for the J. Clyde store, regarding his scheduling needs.  Mohammed Dep. 25:23-25.

29.   The meeting was called because Cole had given Plaintiff the schedule for the following month, September 2010, and Plaintiff was scheduled to work on a Saturday. Mohammed Dep. 25:13-18. Goodman had told Cole that Plaintiff would be shadowing him on Saturdays. Tr. 130:1-4.

30. When Plaintiff reminded Cole that he didn't work on Saturdays, Cole called Goodman for clarification. Mohammed Dep. 25:20-22; Tr. 130:5-6. Cole requested that the three of them meet and Goodman replied that she would come to the store. Tr. 130:15-20. The testimony of Plaintiff and Cole establish that contrary to Goodman's testimony that she visited the store to help Cole address Plaintiff's unauthorized Starbuck's run, the purpose of her going to the store was to resolve the issue with Plaintiff's Saturday schedule. Tr. 132:2-4; Tr.159:18-23.

31. The call to Goodman was necessary because although her store managers created the draft schedule for their respective stores, Goodman finalized each store schedule, which was then distributed to employees by the store managers. Goodman Dep. 82:16-83:11

32. During the meeting, Plaintiff told Goodman that he "could not compromise [his] religious beliefs." Mohammed Dep. 26:1-2.

33. Goodman responded that Plaintiff that "was not being a team player," and that he would never "advance within the company if [he] didn't start working on Saturdays." Mohammed Dep. 26:3-5. Plaintiff replied, "Are you telling me if I don't give up my religious beliefs, I won't go anywhere with the company?" Mohammed Dep. 26:6-8. To which Goodman responded, "That is what I am saying." Mohammed Dep. 26:9.

34. Although Goodman stated Plaintiff was the "designated floater for the Peninsula" area, Plaintiff was assigned to work at five (5) stores outside the Peninsula area, "on [the other] side of the water." These were Bruce Road, Naval Base, Laskin Road, Poplar Hill and General Booth. Mohammed Dep. 20:14-21; 22:5-16. These stores were overseen by different area managers. Plaintiff stated he had to drive more than thirty minutes to work outside of his area. Plaintiff floated to stores within and outside the Peninsula – nine (9) stores in total. Goodman only assigned two other employees as floaters and they each only floated to two (2) stores. Tr. 162:20-163:4

35. On October 17, 2010, Plaintiff engaged in his third protected activity when he emailed Goodman his concerns about his drastically reduced hours. Plaintiff referenced the August 30, 2010 meeting and reiterated that he had been very clear prior to being hired that he required Saturdays off. Pl.'s Ex. 2.

36. On October 18, 2010, Goodman responded to his email and stated that Plaintiff was a full-time employee and he would keep his benefits unless he voluntarily moved to part-time status. *Id.*

37. Goodman stated that hours would decrease or increase in accordance with customer traffic. *Id.* Regarding his schedule, Goodman stated:

> "There is [sic] no concerns with your weekend schedule. As you review the schedule for each store, all employees are rotating or working every Saturday and Sunday. I could definitely use more help on Saturdays. And your schedule

does differ from anyone else's. Although I was not in your initial conversation with Angela and Robin, your requests were honored regarding Saturdays."

*Id.*

38.  Goodman called Plaintiff a "valued employee." *Id.*; Tr. 210: 1-5.

39.  Goodman then explained that his advancement with the company was impeded by "some concerns with work performance," many of which she had addressed with him directly. *Id.* Goodman stated that she could outline those items on paper as a reference and that they would speak later that week. *Id.*

40.  Goodman's email only references work performance concerns in the context of advancement with the company. There is no indication that her concerns regarding work performance issues were so significant that she was considering terminating him. *Id.*

41.  Hours later, Mohammed replied and thanked her for her response. He stated, "[Y]ou have no idea how much it means to me that you care enough to actually coach me to be a better employee." *Id.*

42.  The same day, Goodman forwarded the email chain to Angela Higgerson, the HR manager. *Id.*

43.  On October 20, 2010, Plaintiff met with Goodman to discuss his performance. Goodman reviewed five areas for improvement for Plaintiff which she outlined on a form entitled "Work Performance." Pl.'s Ex. 3.

44.  In her 11 years with Mini Price, Goodman used the Work Performance document only once – with Plaintiff. Tr. 222:18-21. There is no evidence any Mini Price management employee used the "Work Performance" document Goodman used. And unlike the "Verbal Counseling" form and "Written Warning" form, there was no field labeled "Human Resource Use Only" on the "Work Performance" document.

45.  In general, Plaintiff was directed to improve his verbal tone with co-workers, higher management and customers; allow managers to make executive decisions before taking the initiative to do so; cease completing personal tasks during business hours; complete paperwork according to company policy unless given a management directive to do otherwise; and complete assigned daily tasks.

46.  After the meeting Plaintiff stated that he did not get the impression that he was "in trouble" because Goodman just covered "points she wanted [him] to work on to make [him] a stronger manager." Mohammed Dep. 52:17-22. He stated that the meeting wasn't an evaluation. Goodman addressed areas "she wanted [him] to reference so that [he] could help [his] progress with the company which is what [he] requested via e-mail." Mohammed Dep. 51:17-20. She stated that working on those areas "would help [him] with [his] promotion progress" to becoming a store manager. Mohammed Dep. 52:3-14

47.   Goodman stated that the Work Performance form was written documentation of a verbal warning. Goodman Dep. 41:20-23.

48.   Though Goodman stated that she told Plaintiff that if his performance in those areas did not improve, he would be terminated (Tr. 210:1-5; Goodman Dep. 57:8-12), the form does not include any language about termination.

49.   Though the form provides a section for the employee and a witness to sign, the Court notes that there are no signatures on the form.

50.   Plaintiff maintained his health benefits as a floater and there were no changes to his title, pay, or promotion potential.

51.   Sometime in December 2010, Goodman spoke with Plaintiff about his performance. He stated "she mentioned that she saw a 360-degree change in [his] performance activities" and that she "seemed pleased." Mohammed Dep. 54:1-2. Goodman stated that after that conversation she "felt that [they] were going in the right direction" Goodman Dep. 56:15-16. Although she saw "certain processes [that Plaintiff was] doing better," she also observed areas where Plaintiff was not improving. Goodman Dep. 56:5-6. Specifically, Goodman remarked that she saw "a complete decline toward the end of the year" in late November and December Goodman Dep. 56:6-7; 16-17.

52.   On January 31, 2011, Goodman terminated Plaintiff's employment. The reason she gave him for her decision was "productivity." Mohammed Dep. 11:22-24.

On January 31, 2011, the same day she terminated Plaintiff's employment, Goodman emailed Higgerson that Plaintiff was terminated "due to lack of performance and lack of work." Joint Ex. 4.

Although "lack of work" was an option on the VEC documents, Higgerson only checked the field for "discharge" as the reason for Plaintiff's termination. [1] (ECF No. 35, Pl.'s Mem. in Opp to Def.'s Mot. for Summary J. Ex. 4, "VEC Employer's Report of Separation and Wage Information" dated Feb. 15, 2011.)

In an email to Barry Sifen dated March 25, 2014, Goodman attached a list entitled Peninsula Employee Assignment, and stated the reason for Plaintiff's termination as "(performance)." Pl.'s Ex. 8. There was no mention of "lack of work."

During her deposition on November 18, 2014, the sole reason she gave was performance issues. When asked if there were any other reasons, she said no.[2] Goodman Dep. 42:8-11; 22-23.

---

[1] The second page of the VEC document, which asked, *inter alia*, what reason was given to applicant for his termination and whether the applicant had been warned about his conduct, was blank.

[2] Q:    Okay. Why did you decide to terminate Mohammed's employment in January of 2011?
A:    The productivity was still going backwards. There was no consistency in his work.

At trial Goodman stated performance issues and renewed "lack of work" as the reason for Plaintiff's termination. Tr. 182:7-8.

53.   Following his termination, Plaintiff requested and was granted an exit interview. In February 2011, Plaintiff met with Barry Sifen, CEO/CFO, Dana Hicks, Vice President and Higgerson, and stated that he believed he was terminated in retaliation for refusing to work on Saturdays. Mohammed Dep. 65:9-23.

54.   The October 2010 Work Performance form was the only Work Performance form in Plaintiff's personnel file and there were no Verbal Counseling or Written Warning forms in his file. Tr. 262:16- 263:1.

55.   From 2008 to 2010, Plaintiff received a number of secret shop evaluations in which he received an overall rating of "Excellent" or a total score of 100 out of 100 possible points. On one shop he was "rated as providing the best experience across all of Mini Price." Pl's Ex. 4.

56.   After his termination, Plaintiff worked a few part-time jobs. He received full-time employment in January 2014. Mohammed Dep. 44:10-14; 45:2-3.

57.   Neither party addressed damages in their post-trial briefs.

## II.   CONCLUSIONS OF LAW

### A.   Jurisdiction & Venue

1.    This Court has subject matter jurisdiction over claims that arise under federal law

pursuant to 28 U.S.C. §1331. 42 U.S.C. § 2000(e)(5)(f).

2.    This Court has personal jurisdiction over Defendant because Mini Price's principal place

of business is located in the Commonwealth of Virginia.

3.    Venue is proper under 28 U.S.C. § 1391 as Defendant is located in this district and

substantially all the events giving rise to Plaintiff's claims occurred in this district.

---

. . .
Q:    Okay. Any other reasons?
A:    No, not that I can think of.

**B.   Title VII Retaliation Claims**

4.   Title VII makes it "an unlawful employment practice for an employer . . . to fail or refuse
to hire or to discharge any individual, or otherwise to discriminate against any individual
with respect to his compensation, terms, conditions, or privileges of employment,
because of," *inter alia,* an individual's "religion." 42 U.S.C. § 2000e–2(a)(1).

5.   Title VII also includes a retaliation provision that makes it unlawful for an employer "to
discriminate against any of his employees . . . because he has opposed any practice made
an unlawful employment practice by" Title VII. 42 U.S.C. § 2000e–3(a).

6.   The antiretaliation provision prevents "an employer from interfering (through retaliation)
with an employee's efforts to secure or advance enforcement of [Title VII's] basis
guarantees." *Burlington Northern & Santa Fe Ry. Co.*, 548 U.S. 53, 63 (2006).

7.   Title VII does not apply to all retaliation. Rather, it protects an individual from
retaliation that produces an injury or harm. *Id.* at 67.

9.   Where direct evidence of retaliation is lacking, Plaintiff may produce circumstantial
evidence and proceed under the three-step proof scheme set forth in *McDonnell Douglas
Corp. v. Green*, 411 U.S. 792, 802–04 (1973). *Hill v. Lockheed Martin Logistics Mgmt.,
Inc.*, 354 F.3d 277, 284–85 (4th Cir. 2004) (*abrogated on other grounds by Foster v.
Univ. of Maryland-Eastern Shore*, – F.3d –, 2015 WL 2405266 (4th Cir. 2015)).

10.  Under the McDonnell Douglas framework, Plaintiff is tasked with establishing a prima
facie case that:

> (1) he engaged in protected activity;
> (2) Defendant took an adverse employment action against Plaintiff; and
> (3) a causal link between the protected activity and the employment action exists.

*Coleman v. Md. Court of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010).

11.     Plaintiff must establish his prima facie case by a preponderance of the evidence.

        *Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 258 (4th Cir. 1998).

12.     If he succeeds, the burden "shifts to [the defendant] to articulate some legitimate,

        nondiscriminatory reason" for the employment action. *Hawkins v. PepsiCo, Inc.*, 203

        F.3d 274, 278 (4th Cir. 2000) (quoting *O'Connor v. Consol. Coin Caterers Corp.*,

        517 U.S. 308, 311 (1996)). *See also King v. Rumsfeld*, 328 F.3d 145, 151 (4th Cir. 2003)

        ("non-retaliatory" motive for adverse action).

13.     Once the employer produces sufficient evidence to support a non-discriminatory

        explanation for its decision, the plaintiff must "prove by a preponderance of the evidence

        that the legitimate reasons offered by the defendant were not its true reasons, but were a

        pretext for discrimination." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133,

        143 (2000) (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253

        (1981)).

C.      **McDonnell Douglas Framework**

        1.      **Establishing a Prima Facie Case**

                i.      **Protected Activity**

14.     "Protected activities fall into two distinct categories: participation or opposition."

        *Laughlin*, 149 F.3d at 258; 42 U.S.C. § 2000e-3(a).

15.     Protected participation activity occurs when a plaintiff "has made a charge, testified,

        assisted, or participated in any manner in an investigation, proceeding, or hearing under

        [Title VII]." 42 U.S.C. § 2000e-3(a).

16.     Protected opposition activity need not "rise to the level of formal charges of

        discrimination." *Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir. 1981)

(quoting *Sias v. City Demonstration Agency*, 588 F.2d 692, 694–96 (9th Cir. 1978)).

Voicing complaints to employers can constitute protected opposition activity. *Id.*

### ii.    Adverse Employment Action

17.    In determining whether "actionable retaliation" exists, the plaintiff must show that a reasonable employee would have found the challenged action materially adverse.

18.    A materially adverse action is one which might have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 548 U.S. at 67 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.D.C. 2006)).

19.    Acknowledging that the E.E.O.C. has "consistently found that retaliatory work assignments [are] a classic and widely recognized example of forbidden retaliation," the Supreme Court has made it clear that "[w]hether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Id.* at 71 (internal quotation marks omitted) (internal citations omitted).

20.    "[N]ot everything that makes an employee unhappy is an actionable adverse action. *Thorn v. Sebelius*, 766 F. Supp. 2d 585, 599 (D. Md. 2011) (quoting *Settle v. Baltimore Cnty.*, 34 F. Supp. 2d 969, 989 (D. Md. 1999)).

21.    It is well-settled in the Fourth Circuit that "[a]n adverse employment action is a discriminatory act that 'adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.'" *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (quoting *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004)). Moreover, "[a]n adverse action is one that 'constitutes a significant change in

employment status, such as hiring, firing, failing to promote, reassignment with

significantly different responsibilities, or a decision causing a significant change in

benefits." *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 337 (4th Cir. 2011) (quoting

*Burlington Industries Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)).

22.   Where reassignment is the alleged adverse action, it is key that the reassignment presents

"some significant detrimental effect." *Boone v. Goldin*, 178 F.3d 253, 256 (4th Cir.

1999). "[A]bsent any decrease in compensation, job title, level of responsibility, or

opportunity for promotion, reassignment to a new position commensurate with one's

salary level does not constitute an adverse employment action." *Id.* at 257–58.

23.   On their own, inconvenience and mild stress accompanying the reassignment are

insufficient to deem the reassignment an adverse employment action. *See Fitzgerald v.

Ennis Business Forms, Inc.*, Civil Action No. 7:05CV00782, 2007 WL 81797 at *4

(W.D. Va. Jan. 8, 2007) (citing *Boone*, 178 F.3d at 256)).

24.   Plaintiff has not established that his reassignment as a floater was a materially adverse

action.

25.   Termination is an adverse employment action. *See Hoyle*, 650 F.3d at 337.

   iii.   **Causation**

26.   To establish a prima facie case of retaliation in contravention of Title VII, a plaintiff must

prove "(1) that she engaged in a protected activity," as well as "(2) that her employer

took an adverse employment action against her," and "(3) that there was a causal link

between the two events." *Boyer-Liberto v. Fontainebleu Corp.*, – F.3d –, 2015 WL

2116849, at *13 (4th Cir. 2015) (quoting *E.E.O.C. v. Navy Fed. Credit Union*, 424 F.3d

397, 405–06 (4th Cir. 2005)).

13

27.  In a recent decision, the Fourth Circuit ruled that the Supreme Court's decision in *Univ. of Texas Sw. Med. Ctr. v. Nasser*, – U.S. – , 133 S.Ct. 2517 (2013), did not apply a heightened "but-for" standard to the causation prong of a prima facie case of retaliation. *Foster v. Univ. of Maryland-Eastern Shore*, – F.3d –, 2015 WL 2405266, at *5 (4th Cir. 2015). The Court stated that the causation standard for establishing a prima facie retaliation case and proving pretext are not identical. *Id.* at *7.

28.  The Court reasoned that applying but-for causation at the prima facie stage "would be tantamount to eliminating the McDonnell Douglas framework in retaliation cases" because doing so would mean that the only plaintiffs who could use pretext evidence would be those who would not need it. *Id.* The Court stated:

> "If plaintiffs can prove but-for causation at the prima facie stage, they will necessarily be able to satisfy their ultimate burden of persuasion without proceeding through the pretext analysis. Conversely, plaintiffs who cannot satisfy their ultimate burden of persuasion without the support of pretext evidence would never be permitted past the prima facie stage to reach the pretext stage."

*Id.* Determining that the *Nasser* Court did not "plainly and clearly" articulate an intent to "retire *McDonnell Douglas*," the Fourth Circuit held that the causation prong of a prima face case of retaliation remains unchanged. *Id.*

29.  To prove a causal connection, a plaintiff asserting a retaliation claim must be able to show that his employer took the adverse action "*because* the plaintiff engaged in a protected activity.'" *Holland*, 487 F.3d at 218 (4th Cir. 2007) (quoting *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998)).

30.  Thus, to demonstrate causation, a plaintiff must show that the employer was aware of the protected activity. *Id.*

31.    The Fourth Circuit and its courts have looked to factors articulated in the Third

Circuit's *Farrell* decision, to determine whether causation had been established. In

*Farrell*, the Third Circuit stated that causal connection can be established through various

types of circumstantial evidence such as temporal proximity, intervening antagonism or

retaliatory animus, inconsistent reasons for termination, or the defendant's conduct

toward others. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000).

32.    The Fourth Circuit and its courts have applied the factors articulated in *Farrell* to varying

degrees. Where temporal proximity is insufficient to establish a causal connection,

courts have examined whether another factor will provide the causal link. *See Lettieri v.*

*Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007) (where temporal proximity is lacking,

"evidence of recurring retaliatory animus during the intervening period can be

sufficient to satisfy the element of causation."); *Linkous v. CraftMaster Mfg., Inc.*, Civil

Action No. 7:10-CV-00107, 2012 WL 2905598 at *8 (W.D. Va. 2012) ("Because

plaintiff has no evidence of temporal proximity and has not offered any evidence that

[defendant] has offered inconsistent reasons for his termination, plaintiff must rely on an

intervening pattern of retaliatory conduct to prove causation."); *Jaudon v. Elder Health,*

*Inc.*, 125 F. Supp. 2d 153, 165 (D. Md. 2000) (citing *Farrell* and stating that "factors

pertinent to the causation element may include temporal proximity between the two

events, an intervening pattern of retaliatory conduct, inconsistent reasons by employer for

adverse action, and differential treatment of other employees.")

33.    Courts have stated that where there is no temporal proximity, at least one of these factors

must be established. *See e.g., Bush v. Donahoe*, 964 F. Supp. 2d 401, 426 (W.D. Penn.

2013) (unable to show temporal proximity, "[p]laintiff must point to evidence of a

15

pattern of antagonism or retaliatory motive during the intervening period, or show inconsistent reasons given by [d]efendant for the adverse employment actions").

34.  Defendant was aware of Plaintiff's protected activity because his protests were made directly to Goodman, the area manager with final say over his schedule and with the authority to fire him.

35.  Although three months is too long to establish temporal proximity, Plaintiff has raised evidence of inconsistent explanations by Defendant for his termination which satisfy the causal element and allow Plaintiff to establish his prima facie case.

### 2.  Defendant's Legitimate Non-Discriminatory Reason

36.  In offering its explanation of its legitimate, non-discriminatory reason, the employer must be "clear and reasonably specific." *Burdine*, 450 U.S. at 258.

37.  The defendant's burden, however, is one of production, not persuasion. *Causey v. Balog*, 162 F.3d 795, 800 (4th Cir. 1998).

38.  By meeting its burden, the defendant rebuts the presumption of discrimination created by the plaintiff's prima facie case and the presumption "drops from the case." *Laughlin*, 149 F.3d at 258 (quoting *Burdine*, 450 U.S. at 255 n.10).

39.  Defendant stated legitimate non-discriminatory reasons for reclassifying Plaintiff as a floater and terminating him.

### 3.  Plaintiff's Proof of Pretext

40.  Pretext is "a lie or deceit designed to cover one's tracks," not merely a business error. *Holley v. North Carolina Dept. of Admin., N.C.*, 846 F. Supp. 2d 416, 430 (E.D.N.C. 2012) (quoting *Cardoso v. Robert Bosch Corp.*, 427 F.3d 429, 435 (7th Cir. 2005)).

41.   "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'" *Reeves*, 530 U.S. at 147 (quoting *Wright v. West*, 505 U.S. 277, 296 (1992)).

42.   An employer's offer of "different and arguably inconsistent explanations" may allow the factfinder to infer that the articulated reasons are pretextual. *E.E.O.C. v. Sears Roebuck and Co.*, 243 F.3d 846, 853 (4th Cir. 2001) (quoting *Dominguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 432 (1st Cir. 2000)).

43.   The plaintiff cannot base a pretext argument on "minor discrepancies that do not cast doubt on the explanation's validity, or . . . points that are wholly irrelevant to it." *Bonds v. Leavitt*, 629 F.3d 369, 386 (4th Cir. 2011) (quoting *Hux v. City of Newport News*, 451 F.3d 311, 315 (4th Cir. 2006)).

44.   In retaliation cases, the same type of evidence may be used to prove both the causal connection requirement and pretext. *See Jaudon*, 125 F. Supp. 2d at 169 (finding evidence that established plaintiff's prima facie case was also pertinent to plaintiff's allegations of pretext); *Philbrick v. Holder*, 583 F. App'x 478, 490 (6th Cir. 2014) (unreported) ("the court may consider evidence of pretext to buttress [the causal connection] prong of the prima facie case"); *Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 846 (2d Cir. 2013). "A plaintiff may prove [but-for causation] by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action. From such

discrepancies, a [factfinder] could conclude that the explanations were a pretext for a prohibited reason.").

45. "Without evidence of pretext for retaliation, [the] Court will not act as a 'super-personnel department that reexamines an entity's business decisions.'" *Chappell v. School Bd. of City of Virginia Beach*, 12 F. Supp. 2d 509, 517 (quoting *Beall v. Abbott Laboratories*, 130 F. 3d 614, 620 (4th Cir. 1997) (abrogated on other grounds)).

46. "[I]t is not [the court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the [reassignment]." *Hawkins*, 203 F.3d at 279. Evidence of pretext will call into question whether the reasons offered by the defendant employer for its personnel decisions were the true reasons for making those decisions.

47. The record establishes sufficient evidence suggesting that the reasons offered by Goodman for her decision to reassign Plaintiff to a floater position and subsequently terminate him, were not the true reasons for those decisions.

## C. Damages

### 1. Back Pay

48. "[A] Title VII plaintiff is generally entitled to back pay 'as a matter of course.'" *Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1358 (4th Cir. 1995) (quoting *Brady v. Thurston Motor Lines, Inc.*, 753 F.2d 1269, 1273 (4th Cir. 1985)).

49. "An improperly dismissed employee may not remain idle and recover lost wages from the date of discharge." *Edwards v. School Bd. of City of Norton, Va.*, 658 F.2d 951, 956 (4th Cir. 1981). He must make a reasonable effort to find other suitable employment. *Id.* Accordingly, Title VII back pay awards must be reduced by "(i)nterim earnings or

amounts earnable with reasonable diligence by the person or persons discriminated against . . . ." *Id.* (quoting 42 U.S.C. s 2000e-5(g).

50.    Although the duty to mitigate rests with the plaintiff, it is "well established that the employer bears the burden of proving the employee's failure to mitigate." *Martin v. Mecklenburg Cnty.*, 151 F. App'x 275, 282 (4th Cir. 2005) (citing *Cavalier Hotel*, 48 F.3d at 1358).

51.    The amount of a back pay award rests within the discretion of the Court. *Cavalier Hotel*, F.3d at 1358.

## 2.    Front Pay

52.    "The equitable remedy of front pay is generally available when an employer has terminated an employee unlawfully and the employee's reinstatement is not possible." *Taylor v. Republic Servs.*, 968 F. Supp. 2d 768, 802 (E.D. Va. 2013) (quoting *Loveless v. John's Ford, Inc.*, 232 F. App'x 229, 238 (4th Cir.2007) (unpublished per curiam decision) (citation omitted)).

53.    Designed to place a plaintiff in the financial position he would have been in had he been reinstated, front pay should "be granted sparingly" because it could "result in an unfair windfall." *Id.* (quoting *Ford v. Rigidply Rafters, Inc.*, 984 F. Supp. 386, 392 (D. Md. 1997)).

54.    Although "[t]he Fourth Circuit has not specifically enumerated a list of factors to consider in deciding to award front pay[,] [o]ther courts have considered the plaintiff's prospect of obtaining comparable employment; the time period of the award; whether the plaintiff intended to work; and whether liquidated damages have been awarded." *Id.* (quoting *Ford*, 984 F. Supp. at 392). "Because front pay necessarily involves speculation

as to future events, the Court must judiciously scrutinize the record to determine whether future events are sufficiently predictable to justify such an award." (quoting *Ford*, 984 F. Supp. at 392).

55.  Front pay is awarded at the discretion of the district court. *Id.*

### 3.  Compensatory Damages

56.  "Under Title VII, compensatory damages are available for, among other things, 'emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.'" *Homesley v. Freightliner Corp.*, 60 F. App'x 105, 116 42 (quoting U.S.C. § 1981a(b)(3)). An award of compensatory damages must be supported by the record.

### 4.  Punitive Damages

57.  Punitive damages are available under Title VII only in cases where "the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1); *see Kolstad v. Am. Dental Assn.*, 527 U.S. 526, 535 (1999).

### 5.  Prejudgment Interest

58.  In *Loeffler v. Frank*, the Supreme Court held that consistent with the "make-whole" scheme of Section 706(g) of Title VII, "Title VII authorizes prejudgment interest as part of the back pay remedy in suits against private employers." 486 U.S. 549, 557 (1988).

59.  "Prejudgement interest serves to compensate for the loss of use of money due as damages from the time the claim accrues until judgment is entered, thereby achieving full

compensation for the injury those damages are intended to redress." *West Virginia v. United States*, 479 U.S. 305, 310 n. 2 (1987).

60.   "Prejudgment interest, like all monetary interest, is simply compensation for the use or forbearance of money owed." *Transmatic, Inc. v. Gulton Industries, Inc.*, 180 F.3d 1343, 1347 (Fed. Cir. 1999). *See Maksymchuk v. Frank*, 987 F.2d 1072, 1077 ("A dollar tomorrow, unless interest is added, does not equal a dollar today."); *City of Milwaukee v. Cement Division, National Gypsum, Co.*, 515 U.S. 189, 197 (1995) ("[p]rejudgment interest is not awarded as a penalty; it is merely an element of just compensation.").

61.   Prejudgment interest lies within the sound discretion of the Court. *Maksymchuk*, 987 F.2d at 1077. "An appropriate method to calculate prejudgment interest is to compound the total amount of back pay for the period between Plaintiff's termination from [employer] and the date of the jury's verdict, at an interest rate corresponding to the average inflation rate for that time period." [3] *Ford v. Rigidply Rafters, Inc.*, 984 F. Supp. 386, 391 (D. Md. 1997).

   6.   **Attorneys' Fees**

62.   The prevailing party on a claim for retaliatory discharge is entitled to attorneys' fees and costs. 42 U.S.C. § 2000e–5(k). A reduced fee award is appropriate if the relief, however significant, is limited in comparison to the scope of the litigation as a whole." *Hensley v. Eckerhart*, 461 U.S. 424, 435, 439–40 (1983).

---

[3] The Court in *Ford* employed the following compound interest formula: $F = P\,[\,1 + (i/12)\,]^{m}$. Where F = future value of money (total of principal and interest), P = principal (back pay award), i = interest rate expressed as a decimal, and m = number of months compounded. *Ford*, 984 F. Supp. at 392 (citing Jose A. Sepulveda et al., Theory of Problems of Engineering Economics MICS 12 (1984)).

## III.   DISCUSSION

A.   **Plaintiff's Retaliation Claims**

    1.   **Reclassification as a Floater**

        a.   **Prima Facie Case**

The Court finds that Plaintiff has failed to establish a prima facie case that his reclassification as a floater was an actionable retaliatory act. The second prong is established by the two meetings he had with Goodman in August 2010 (the first being one-on-one at an undetermined date and the second occurring later on August 30 with Cole present). The third prong is established by the very close causal connection between the August 30 meeting and his reclassification as a floater one month later in October, and the conflicting reasons Goodman gave for making him a floater.[4] Nevertheless, the Court finds Plaintiff has failed to establish the second prong because he has not presented sufficient evidence that reclassification as a floater was an adverse action.

Personnel decisions that result in a "mere inconvenience" do not constitute an adverse employment action, unless that inconvenience causes a significant change in employment status. *See Nichols v. Comcast Cablevision of Maryland*, 84 F. Supp. 2d 642, 659 (D. Md. 2000) ("[a] mere inconvenience without a significant change in employment status is insufficient").

---

[4] The record establishes that Defendant's stated reason for reclassifying Plaintiff was pretext. Although Defendant claims the measure was taken as part of a reduction in store hours, Goodman's inconsistent statements as found in the VEC documentation, her deposition, her affidavit, and her testimony at trial. In her written statement to the VEC, Goodman stated that she made Plaintiff a floater because of complaints she had received from the store managers. Pl.'s Ex. 6, "T. Goodman 10/21/10 - 1/31/11 Summary." In her deposition, she expressly denied that she made him a floater as a means of punishment. Goodman Dep. 60:10 – 17; 61:2 – 6. Rather, she stated that she reclassified him because he was familiar with the stores and the properties. She also stated that it was a positive opportunity for Plaintiff. Goodman Dep. 67:5 – 25. In her affidavit, she stated that she chose him because he had the most experience and had familiarity with almost all the store locations. (ECF No. 36, Pl.'s Reply to Def.'s Resp. in Opp. to Pl.'s Mot. for Summary J., Affidavit of Tashondi Goodman, Dec. 16, 2014.) Finally, at trial, she again denied that she made him a floater as a form of discipline and that his productivity was not a factor. Tr. 193:9-15; 194:15-18.

A change in working conditions becomes materially adverse only if it is "more disruptive than a mere inconvenience." *Galabva v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000). An inconvenience, such as an increased commute or unfavorable hours, does not constitute an adverse employment action for the purposes of Title VII. *See Johnson v. Eastchester Union Free Sch. Dist.*, 211 F. Supp. 2d 514, 518 (S.D.N.Y. 2002). A longer commute, on its own, does not constitute an adverse employment action. *See Smith v. Alabama Dept. of Pub. Safety*, 64 F. Supp. 2d, 1215, 1222 (M.D. Ala. 1999) (citing *Spring v. Sheboygan Area Sch. Dist.*, 865 F2d 883, 886 (7th Cir. 1989)).

The Fourth Circuit has held that "absent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position." *Boone*, 178 F.3d at 256-57. Plaintiff argues that the transition to floater status was adverse because Plaintiff had to travel longer distances without compensation, he was no longer assigned to a home store, and was no longer guaranteed set hours at one location. The Court finds that these factors were mere inconveniences and do not rise to the standard set forth by the Fourth Circuit in *Boone*.

As explained in this court's January 2015 Order, there was no material change in Plaintiff's benefits, pay, or actual hours worked during his time as a full-time floater. Furthermore, Plaintiff admits he was paid mileage for his commute while a floater. Although the Court questioned whether Plaintiff's title had been changed from Assistant Manager to Sales Associate, there is no evidence that the discrepancy in how Plaintiff was referred to in payroll documents was the result of anything other than a default software setting. Because Plaintiff does not press the point, the Court will resolve that issue in Defendant's favor. Moreover, Plaintiff

23

does not allege that his promotional opportunities or employment status was affected by his reclassification. Plaintiff also fails to allege or offer evidence that being made a floater resulted in a decrease in prestige or job responsibilities. Consequently, Plaintiff does not allege any legally cognizable injury or harm flowing from his reclassification as a floater. Therefore, Plaintiff has failed to establish that his reclassification as a floater constitutes a materially adverse employment action.

### 2. Termination

#### a. Prima Facie Case

The first prong of Plaintiff's prima facie case is established by the three acts of protected activity Plaintiff engaged in, the two meetings in August and the October 17 email he sent to Goodman. The third prong is also established because termination is an adverse action. Regarding the second prong, although three months is not sufficiently close to establish temporal proximity, *see Pascual v. Lowe's Home Centers, Inc.*, 193 F. App'x 229, 233 (4th Cir. 2006) (stating three to four months is too long to establish a causal connection by temporal proximity alone), causation is established through Goodman's inconsistent reasons for her decision to fire Plaintiff.

First, on January 31, 2011, Goodman told Plaintiff that he was terminated for "productivity" and "inconsistency" issues. Second, later that day she sent an email to Higgerson and stated he was terminated "due to lack of performance and lack of work." This is the first time "lack of work" arises as a reason. During her third rehashing, in an email to Barry Sifen dated March 25, 2014, Goodman attached a list entitled Peninsula Employee Assignment and stated the reason for Plaintiff's termination as "(performance)." There was no mention of "lack of work." And, on her fourth opportunity to explain her actions, during her deposition on

24

November 18, 2014, the sole reason she gave, yet again, was performance issues. When asked if there were any other reasons, she said no. Nonetheless, while testifying during trial on January 27, 2015, she cited performance issues and renewed her "lack of work" excuse. The evidence establishes that on five separate occasions, Goodman had an opportunity to explain why she terminated Plaintiff. And nearly every time she gave a different answer from the previous answer.

Although Plaintiff has not presented evidence that his position was subsequently filled, which is the kind of evidence typically submitted when lack of work is set forth as the legitimate business reason, he has put forth evidence that Goodman hired full-time store employees during the same time frame she was tasked with staffing her stores down. Apart from these hiring decisions, the Court finds Goodman's statements to be so lacking in credibility that her "lack of work" assertion merits no weight absent evidence to the contrary. Thus, Defendant's inconsistency in citing the reasons for Plaintiff's termination is sufficient to establish causation.

### b.   Legitimate Non-Discriminatory Reason

Lack of work is a permissible basis for employment decisions. *Mirza v. Dept. of Treasury*, 875 F. Supp. 513, 521 (N.D. Ill. 1995). Job performance is also widely recognized as a valid, non-discriminatory base for employment decisions. *Chappell*, 12 F. Supp. 2d at 517 (citing *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996)). In wrongful termination suits, what is relevant is "the perception of the decision maker . . . not the self-assessment of the plaintiff." *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000).

Defendant put forth two legitimate non-discriminatory reasons for Plaintiff's termination – poor performance and lack of work.

### c.   Pretext

Although Defendant articulated nondiscriminatory reasons (*e.g.*, that there was a lack of work and that Plaintiff's work performance was inadequate) for its actions, the preponderance of the evidence establishes that these proffered reasons are pretextual.

### i.   Shifting Rationale for Termination

The Fourth Circuit has stated that a plaintiff presents sufficient evidence of pretext by showing that his employer first asserted he was being fired for lack of work, and then later alleged that he was fired for unsatisfactory job performance. *Holland*, 487 F.3d at 222 (citing *Alvarado v. Bd. of Trustees*, 928, F.2d 118, 122-23 (4th Cir. 1991)). In this case, the same evidence used to establish causation applies to pretext. Goodman has fluctuated between two contradictory reasons.

### ii.   Inconsistent Application of Policy

"[A]n informal policy is no less a policy," and its selective, erratic, or "case-by-case" application by the employer may suggest pretext. *See Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 297-99 (4th Cir. 2010). On its own, an employer's failure "to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal discriminatory intent." *Vaughan v. Metrahealth Cos., Inc.*, 145 F.3d 197, 203 (4th Cir. 1998) (abrogated on other grounds) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 454 (10th Cir. 1995). *See also Daniel v. Pickens Cnty. Sheriff Dept.*, 2009 WL 2394343, *18 (D.S.C. July 31, 2009 (same). The manner in which an employer implements a disciplinary policy "might be evidence of pretext." *Matvia v. Bald Head Island Mgmt. Inc.*, 259 F.3d 261, 272 (4th Cir. 2001)).

On this matter, the Court finds Goodman's testimony to be evasive and incredible. The Court first considers Goodman's deposition testimony. Despite nearly 10 years of experience in a

managerial role with Mini Price, nine of which she spent as an area manager for more than 15 stores, Goodman was unable to recall the name, store location, or time period of at least one individual she claimed to have terminated for productivity issues, such as failure to properly complete paperwork. Goodman Dep. 45:8 – 46:2. Goodman's inability to recall these details is suggestive of pretext.

And although Goodman stated that she had a policy that she follows, she was not sure whether her process was the employer's policy:

> Q:  Okay. So can you tell me what that policy is, what the procedure is for counseling an employee?
>
> A:  I can tell you the policy of what I practice, which is I follow a verbal and then I go through a written process. I do two write-ups. One of those write-ups may end in termination if it gets to the second one. If it gets to the second write-up and then there's a third one, that's when termination is. So it could possibly be a termination anywhere between your first write-up and your second one, but by the third time that you're getting written up, you will be terminated.

Goodman Dep. 19:6-17.

> Q:  Okay. And is that policy in the Mini Price handbook?
> A:  I cannot be for certain.
> Q:  Okay. So is it accurate to say that that's your policy as a -- your personal policy, not the company's policy?
> A:  That's what I practice.
> Q:  And you're not sure if that's what the company policy is?
> A:  No.

Goodman Dep. 19:18 – 20:2.

But despite the fact that she supposedly did not know the corporate policy for counseling employees, she stated that she knew it was written in the employment handbook, a handbook she also stated she had not seen. Goodman Dep. 18:3-19:1.[5] When asked again, she reiterated that she was not sure whether what she practiced was company policy.[6]

---

[5] Q:  Okay. So you have a Mini Price employee handbook; is that correct?
A:  Correct.

The Court finds it incredible that Goodman, who had eight years of managerial experience, managing upwards of 15 Mini Price stores, a) had not seen the employee handbook and b) did not know whether the progressive discipline policy she followed for nearly ten years was the same policy found in the employee handbook she never bothered to read.

Goodman's testimony at trial was likewise incredible. First, Goodman unsuccessfully attempted to distance herself from her deposition testimony that she practiced a set policy for eight years. On the stand, she attempted to argue that the policy she mentioned was one that she used currently, not when Plaintiff was an employee. The Court finds that during her deposition, Goodman volunteered information regarding a practice she had developed and used for eight years, which clearly included the timeframe in which Plaintiff was an employee. Indeed, after a lengthy discussion regarding the verbal and written warning documents, Goodman was asked:

> Q:  Okay. And how long has this been the policy that you have followed?
> A:  Eight years.
>
> . . .
>
> Q:  Okay. So starting back in 2006 when you were the Southside area manager, you had been following this procedure since that time?
> A:  Correct.

Goodman Dep. 22:13-15; 19-22.

Second, the Court notes that Goodman stated that at the time she fired Plaintiff she did not have any forms. Tr. 212:1. Not only did this contradict Goodman's testimony at her deposition, it also contradicted evidence Plaintiff presented of the "Verbal Counseling" and "Written Warning" documents she used in 2009 with other employees.

In addition, Goodman gave conflicting testimony regarding the use of forms and whether she was even permitted to use them. At one point she testified, "I used all kinds of different

---

Q:  Okay. And does that handbook have a policy in it regarding counseling of employees.
A:  I haven't seen the handbook. I know there's one in there. I don't know how it's outlined.
[6] Goodman Dep. 19:25 – 20:2.

forms, and sometimes I didn't use forms at all." Tr. 218:3-5. Immediately thereafter she stated, "[W]e weren't authorized to use forms." Tr. 218:7-8. And still later she testified that when Sean was an employee, she and her fellow area managers "were able to do what [they] wanted to do as far as documents." Tr. 219:20-21. This testimony conflicts with her testimony during her deposition in which she answered in the affirmative whether the "Written Warning" document was a form document maintained by Mini Price.[7] Goodman Dep. 20:14-20. That the document was maintained by Mini Price is believable because it includes a field for the HR department to complete. The format of these forms, and the fact that she and her fellow area managers used them, undercut Goodman's contention that she was not authorized to use forms.

From this testimony the Court concludes that regardless of whether Mini Price had a formal policy for progressive discipline, Goodman, by her own admission, did. The fact that Goodman did not follow her own policy with Plaintiff and that she gave false and misleading statements about whether this was a new policy or one which she had used for years at Mini Price, indicate pretext.

In addition, the Court does not find Goodman's characterization of the document as documentation of a verbal warning to be credible. First, the Court considers the context of how the meeting arose. The impetus for their October meeting was an email conversation in which Plaintiff expressed a desire to advance with the company and his concerns that his need for a religious accommodation was viewed as a hindrance to that goal. In response, Goodman downplayed his need for Saturdays off and stated that his advancement was stymied by performance issues. But critically, in that message she did not use any language that suggested

---

[7] Q:    The document you're talking about, if it gets to the written stage, is that a form document that the company maintains?
A:    Yes.
Q:    So there's a Mini Price written warning document?
A:    Yes.

that his performance issues were so significant that his continued employment was in jeopardy. There is a stark difference between being promotable (which Plaintiff was concerned about) and being on the brink of getting the pink slip. If Plaintiff was in danger of losing his job, Goodman would have said so in that email. Her failure to do so lends credence to Plaintiff's characterization of the in-person meeting that followed as merely a coaching session in which Goodman outlined the areas in which Plaintiff needed to improve in the context of obtaining his desired promotion, and that Goodman did not mention the possibility of termination. In other words, if Goodman sought to communicate the supposed severity of Plaintiff's standing with the company, she would have stated that in her email instead of framing his performance issues as matters impeding his advancement into store management only.

Second, unlike the document entitled "Verbal Counseling," a form entitled "Work Performance" does not give any notice whatsoever that termination would follow. The Verbal Counseling form has fields that clearly communicate the severity of a violation. The field "Reason(s) for verbal counseling," indicates why it is being given; the field "Previous actions taken" indicate that the conduct being addressed has been raised as a problem previously; and the field "Corrective action required," which also appears in bold font, indicates what an employee must do to adequately address the issue. Moreover, the use of the term "required" signals that any language that follows would entail mandatory actions for the employee and one could reasonably infer that a failure to take those actions might result in termination.

The Court also notes that the Work Performance form was Goodman's second means of written communication with Plaintiff, with the first being the aforementioned email message. If Goodman intended to communicate that termination would result if Plaintiff's performance did not improve, she would have given him the "Verbal Counseling" form, a document she had used

in the past with other employees. If that document was unavailable and she had to use the Work Performance form, a form no other area manager had seen or used,[8] and a form Goodman admitted she had never given to any other employee,[9] she would have noted on the form that termination was a possibility if Plaintiff's performance did not improve. Her failure to do either, coupled with her failure to raise termination in her email to Plaintiff, causes the Court to doubt that she ever told Plaintiff he could be fired because of performance issues.

It is clear to the Court that the context of Goodman's meeting with Plaintiff was his suitability for promotion not termination. Further, despite engaging in two means of written communication with Plaintiff – once by email and a second time by use of the Work Performance form – Goodman never mentioned that Plaintiff was in danger of losing his job. These facts, along with her failure to follow her own policy of progressive discipline establish that Goodman's decision to fire Plaintiff was pretexual.

### iii. Employer's Longstanding Tolerance of Plaintiff's Job Performance Issues

Of added relevance to the pretext determination is whether the plaintiff had a disciplinary record prior to termination. *Jaudon*, 125 F. Supp. 2d at 170. In determining whether an employer's performance-related rationale for terminating plaintiff's employment was genuine, the Court should consider "whether the performance-related problems were longstanding such that the employer had tolerated them for a long time, and suspiciously ceased tolerating the performance deficits around the time the employee engaged in protected activity. . . . [T]hese

---

[8] Robert Hinson, an area manager stated that he recognized the Verbal Counseling and Written Warning forms, but did not recognize the Work Performance form. *See* Tr. 145:16- 146:1. The Court also notes that although Ms. Higgerson stated at trial that the Work Performance and written warning forms were "used interchangeably," (Tr. 262:14-15), that other managers had used the Work Performance form and she had seen them in the files of other employees, (Tr. 254:20-24), when asked whether she was "sure" that she had seen the Work Performance form applied to other employees, she stated, "I've seen this format. I'm not sure as far as the title. It may have been difference, but the format, yes, I've seen this." Tr. 259:2-6. The Court also notes that Defendant failed to produce any evidence that the Work Performance form was used by anyone else.

[9] Tr. 222:18-21

factors help courts distinguish cases where performance concerns are genuine from those in which they are a mere pretext for retaliation." *Louis v. Sun Edison, LLC*, 797 F. Supp. 2d 691, 705 (D. Md. 2011).

Plaintiff began working for Mini Price in February 2007. In nearly four years, it is undisputed that the only physical evidence of any issue whatsoever Defendant had with Plaintiff's performance was the Work Performance document Goodman completed two days after Plaintiff's email, his third complaint about his religious accommodation.

Plaintiff does not dispute that he had been coached regarding his job performance while he was an employee. Indeed, Goodman routinely provided coaching to all of her store employees. However, there is no evidence that prior to August 2010, the earliest date of his protected activity, Goodman (or any of the store managers Plaintiff worked for) counseled him or expressed dissatisfaction with his performance such that he was in danger of termination. Moreover, all of the negative statements regarding Plaintiff's performance were drafted months after his termination as a result of Defendant's effort to either fight Plaintiff's EEOC complaint or his VEC claim. The fact that Goodman and Hinson did not document these alleged concerns contemporaneous to their occurrences lessens their credibility.

The record before the Court includes evidence of Plaintiff's errors concerning contracts and failure to make the requisite number of daily collection calls. In the Court's view, the problem with these documents is that with one exception, they all account for performance errors that occurred after Plaintiff engaged in his protected activity. The call logs are from September 2010 to November 2010. In addition, Defendant alleges that Plaintiff was consistently drafting contracts with the wrong price. The only contract Defendant submitted in support of this

allegation is dated July 11, 2010, but it does not establish an error by Plaintiff.[10] Defendant

contends that Plaintiff's alleged failure to complete contracts stems back to at least June 2, 2010.

Indeed, Defendant submitted forms that show that since March 2010, when Goodman became

Plaintiff's area manager, there were at least four occasions on which Plaintiff failed to submit

forms correctly: June 2, 2010, July 11, 2010, August 27, 2010, and October 15, 2010. The Court

notes that there is no evidence that Goodman warned Plaintiff about her concerns until after his

protected activities – his two discussions with her in August, his Oct. 17 email, and the Oct. 20

meeting.

Coupled with the fact that despite nearly four years of employment, Defendant has not

produced any performance reviews for Plaintiff and there is evidence that Plaintiff consistently

excelled in his mystery shops, as a whole, the record establishes that whatever shortcomings

existed with respect to Plaintiff's performance, Goodman tolerated them until he engaged in

protected activity. This is despite the fact that Goodman had a "set practice" she had followed for

eight years to coach and or discipline employees. Plaintiff has put forth sufficient evidence that

Goodman's "proffered explanation is unworthy of credence," *Rowe v. Marlye Co.*, 233 F.3d 825,

829 (4th Cir. 2000), and that Goodman's discriminatory motive was the determining factor in his

termination.

---

[10] The Court does not find that Plaintiff made an error regarding pricing for the January 2, 2011 contract because the rate sheet Defendant included only covered August 9, 2010 to November 30, 2010. The chart did not list the prices for January 2011 or even December 2010. The Court also notes that the other contracts Defendant attempted to enter into evidence were illegible and therefore refused.

**B.   Damages**

Plaintiff's Complaint requests back pay and prejudgment interest in the amount of $49,888.99; future back pay or "front pay" in the amount of $86,487.16 for an estimated four (4) years; compensatory damages of an undetermined amount; punitive damages in the amount of $163,623.85; and attorneys' fees and costs.

**1.   Back Pay**

Plaintiff seeks back pay in the amount of $49,888.99 and prejudgment interest. It is undisputed that at the time of his termination on January 31, 2011, Plaintiff's salary was $21,500.00 per year and that obtained full-time employment in November 2014. Accordingly, the Court calculates Plaintiff's back pay for 46 months at a rate of $21,500.00 per year as $82,416.52.

The Court finds that Plaintiff's testimony at trial established that he mitigated his damages in the interim by taking part-time positions as a nightclub doorman and front desk staff at a hotel and therefore reduces his back pay amount by $9,600.00 to $72,816.52.

In this case, the back pay is compounded for the fifty-three (53) months between Plaintiff's termination and the date of this Order. The Court will use a 0.166 % rate of interest, based on the approximate average interest rate during the time period. Using the formula set forth in *Ford*, the Court will grant Plaintiff **$150,730.19**.

Therefore, the Court hereby **ORDERS** a back pay award in the amount of **$150,730.19**.

**2.   Front Pay**

The Court has reviewed the record and finds there is insufficient basis for an award of front pay.

34

### 3.   Compensatory Damages

The Court has reviewed the record and finds that Plaintiff did not offer any evidence of emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, or other nonpecuniary losses. Therefore, there is insufficient basis for an award of compensatory damages.

### 4.   Punitive Damages

Because Plaintiff has not demonstrated that Defendant engaged in a discriminatory practice with malice or reckless indifference, the Court declines to award punitive damages.

### 4.   Attorneys' Fees

As the prevailing party on his claim for retaliatory discharge, Plaintiff is entitled to reasonable attorneys' fees and costs. 42 U.S.C. § 2000e–5(k).

## IV.   CONCLUSION

After carefully considering the evidence introduced at trial, the arguments of counsel, and the law pertaining to this matter, the Court **FINDS** that Defendant is liable on Plaintiff's retaliation claim based on his termination. Accordingly, the Court hereby **ENTERS JUDGMENT FOR SEAN MOHAMMED** and awards him **$150,730.19** in back pay with prejudgment interest, as well as reasonable attorneys' fees and costs. Within fourteen (14) days of the date of this Order, Plaintiff is **ORDERED** to submit proper documentation in support of the attorneys' fees and costs that he seeks for prevailing on his claim for retaliatory discharge.

The Clerk is **DIRECTED** to send a copy of this Memorandum Opinion and Order to counsel for the Parties.

**IT IS SO ORDERED.**

Norfolk, Virginia
June 5 , 2015

_____
Raymond A. Jackson
United States District Judge